UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In re BABCOCK & WILCOX COMPANY          CIVIL ACTION

                                        NO: 09-3684

                                        BANKRUPTCY NO.

                                        NO: 00-10992"B"


**ORDER AND REASONS**

Before the Court are cross-appeals from the April 8, 2009 order entered by the United States Bankruptcy Court, Eastern District of Louisiana, in which the Bankruptcy Court limited creditor PMAC Ltd.'s claim to $147,203.99. *In re Babcock & Wilcox Co.*, 413 B.R. 337, 339 (Bank. E.D.La. 2009). For the following reasons, the Court VACATES the Bankruptcy Court's order and REMANDS with instructions to dismiss PMAC's claim.


**I.    BACKGROUND**

**A.    FACTUAL BACKGROUND**

    **1.    *The Koppel Plant***

PMAC's bankruptcy claim concerns the allocation of environmental liabilities between PMAC and B&W in an amended 1990 Purchase & Sale Agreement ("PSA"). Before 1988, B&W was in the business of manufacturing and selling steel tubing for various applications and purposes. *See* PMAC Statement of Undisputed

Facts, PMAC Br., App. A. B&W's Tubular Products Division conducted these operations in several separate manufacturing facilities in Pennsylvania and Texas. *Id.* The Koppel Plant, located in Koppel, Pennsylvania, was one such facility. *See* Joint Stipulations of Fact ("JSF"), Item #3. The Koppel plant used electric arc furnaces to melt steel and produce carbon and alloy steel. *Id.* A byproduct of this process is electric arc furnace dust ("EAF Dust"), a known hazardous substance and source of environmental liability. *See id.* at Item #4.

In December of 1989, B&W and PMAC began negotiations over the sale of B&W's Tubular Products Division, including the Koppel Plant. *See* PMAC Statement of Undisputed Facts, PMAC Br., App. A. The parties entered into a Letter Agreement of Understanding, negotiated the terms of the sale, and finalized the PSA on January 15, 1990. *Id.* at Ex. A. The parties amended the PSA on June 25, 1990 and closed the deal on October 4, 1990. JSF, Item #34. In total, PMAC purchased the Koppel Plant and four other manufacturing facilities from B&W for a purchase price of approximately $50 million. *See* PSA Section 3.06, B&W Br., Ex. C. On the date of closing, PMAC assigned its rights to the Koppel Plant and another purchased facility to Koppel Steel Corporation ("KSC") for $94.9 million. *See* PMAC-KSC Agreement, B&W Supp. Manual Attach., Ex. A.

### 2. The PSA

B&W and PMAC recognized that potential environmental liabilities existed at the Koppel Plant. The parties apportioned the environmental liabilities in various provisions of the PSA, including Sections 3.03, 3.04, and 6.08. JSF, Item #22 and #25. The Bankruptcy Court, in interpreting these provisions, focused on the "as is, where is, with all faults" nature of the agreement. *See In re Babcock & Wilcox Co.*, 413 B.R. at 339. The tenor of the agreement is one of an "as is" sale, with the exception of certain specific liabilities discussed below. *See* PSA, Section 4, B&W Br., Ex. C. Under the PSA, PMAC assumed post-closing liabilities, assigned B&W certain specific pre-closing liabilities, and gave B&W the option to assume the remaining liabilities. *See id.* at Section 3.03(e) and 6.08(a). The various provisions of the PSA set out this structure as follows.

Sections 3.03 and 3.04 outline the liabilities that PMAC expressly assumed and excluded, respectively. *Id.* at Item #22. In Section 3.03(e), PMAC assumes those pre-closing environmental liabilities provided in Section 6.08 of the PSA. *Id.* at Item #25. Section 3.04 then indicates that PMAC is not subject to liabilities in existence before the closing and not specifically assumed in Section 6.08. *Id.* at Item #22. Of particular note, Section 3.04(h) exempts PMAC from liability related to the EAF Dust pile at the Koppel Plant and the landfill to which B&W was

transferring and disposing the EAF Dust.  *Id.*

Section 6.08(a) delineates the pre-closing environmental liabilities PMAC expressly assumes.  *Id.* at Item #25.  It does so by establishing a procedure for the parties to discover environmental problems before closing and apportion liability for them.  *Id.*  First, PMAC was responsible for conducting an environmental audit before March 15, 1990.  PMAC was then to provide the written results of this audit to B&W.  *Id.*  Next, PMAC was to compile a list of environmental issues for which it wanted B&W to assume liability, known as "Identified Actions." *Id.*  B&W then had the option to assume or reject liability for the Identified Actions.  *Id.*  If B&W chose not to assume liability for any of PMAC's Identified Actions, PMAC was left with two alternatives: terminate the transaction and receive a refund for any deposit it had made, or proceed with the transaction and assume liability for any disputed Identified Action.  *Id.*  Thus, if B&W refused any of PMAC's Identified Actions and PMAC still wanted to go forward with the deal, PMAC assumed the liability for the action.  *Id.*

Section 6.08(b) addresses responsibility for post-closing environmental liabilities.  *Id.*  Thus, Section 6.08(a) and 6.08(b) differ in terms of the time of "discovery" of the environmental problem.  Section 6.08(a) covers those discovered before closing, and Section 6.08(b) those discovered after

closing.  Under Section 6.08(b), B&W assumed liability for the first $250,000 of remediation costs for environmental problems discovered after but within five years of closing.  *Id.*  The parties agreed to apportion costs in excess of $250,000 between them, with B&W bearing two-thirds and PMAC bearing one-third of any remaining costs.  *Id.*  The PSA is silent as to remediation costs for environmental problems discovered after five years of closing.

### 3.  *Burgess & Niple Environmental Audit*

Burgess & Niple, an environmental consulting firm hired by PMAC, did the environmental audit under Section 6.08(a) of the PSA.  *Id.* at Item #27.  Burgess & Niple produced a detailed report of its audit, which it delivered to PMAC on February 28, 1990 ("February 28 Report").  *Id.* at Item #28.  The February 28 Report identifies 78 environmental issues or concerns at the Koppel Plant.  *Id.*  The report assesses each environmental issue in terms of its risk of environmental impact and concomitant remediation cost.  *See* February 28 Report, B&W Supp. Manual Attach., Ex. B.  The report divides each environmental issue into one of three categories: those carrying significant risk, those carrying intermediate risk, and those carrying low risk.[1] *Id.*

---

[1] The February 28 Report defines significant risk issues as those with remediation costs in excess of $500,000; intermediate risk issues as those having remediation costs less than $500,000 but a "reasonable probability of creating adverse environmental impacts"; and low risk issues as those having a low probability

The February 28 Report also provides estimated remediation costs for all "Known Environmental Issues" and "Significant Environmental Issues." *Id.* The report provides no cost estimate for those environmental issues categorized as having either "intermediate risk" or "low risk." *Id.*

On March 15, 1990, PMAC provided B&W with a version of the Burgess & Niple environmental audit ("March 15 Report"). JSF, Item #29. The March 15 Report differed from the February 28 Report in a significant way. *Compare* March 15 Report, B&W Supp. Manual Attach., Ex. C; *with* February 28 Report, B&W Supp. Manual Attach., Ex. B. The March 15 Report did not include those environmental problems in the February 28 Report categorized as having intermediate or low risk. *Id.*

### 4. *First Amendment to the PSA*

After the Section 6.08 audit, the parties adopted the First Amendment to the PSA to resolve environmental issues raised by the audit. JSF, Item #32; First Amendment to PSA, B&W Br., Ex. D. In the main, PMAC assumed liability for existing environmental problems identified in the March 15 Report in exchange for a credit against the purchase price. First Amendment to PAS, B&W Br., Ex. D. At the time the parties negotiated the amendment, they knew B&W would apply to the EPA

---

of creating adverse environmental impact. *See* February 28 Report, B&W Supp. Manual Attach., Ex. B.

for a permit to carry out its agreement to remove the EAF Dust,
including transferring the dust to a landfill and closing the
landfill.  The parties also knew the EPA would perform a site
assessment at Koppel as part of the permit process.  In addition,
the parties knew the EPA could condition its permit on
remediation of areas apart from those containing EAF Dust.  In
light of this information, the parties negotiated Section 2(b) to
deal with remedial action arising from the EPA permit process.
The meaning of Section 2(b) is at issue in this appeal, but it
provides as follows.

> Seller agrees to promptly and diligently undertake,
> whether before or after the Closing, all remedial actions
> necessary to clean up any Solid Waste Management Unit (as
> defined by the Resource Conservation Recovery Act
> ["RCRA"]) or Areas of Concern identified by the EPA
> and/or the PA DER as a result of the April, 1990 EPA and
> PA DER site assessment of the Koppel Plant and any other
> follow-up assessment or investigation related to the
> April, 1990 site assessment in connection with the RCRA
> Part B Closure of the Koppel Landfill and any Areas of
> Concern identified, provided such actions are based on
> conditions in existence at the Koppel Plant at or prior
> to the Effective Time (the "Koppel Site Assessment").
> Seller shall bear any and all costs associated with such
> remedial activities and shall use its best efforts not to
> disturb or injure any part of the Acquired Assets
> comprising the Koppel Plant or interfere with the
> operations of the Koppel Plant.  Seller shall indemnify
> and hold Buyer, its successors and assigns, and all of
> their respective shareholders, partners, officers,
> employees and agents harmless from and against any cost,
> expense, claim, action, liability and obligation
> including, without limitation, reasonable counsel fees,
> in any way arising from or relating to such remedial
> actions pursuant to Article X of the Agreement, except
> that any amounts required to be paid by Seller under this
> paragraph 2(b) shall be excluded from the Cap and
> Deductible provided for in Section 10.04 of the

Agreement.

First Amendment to PSA, B&W Br., Ex. D.

The parties also negotiated a Second Amendment to the PSA as part of the closing. JSF, Item #40. In the Second Amendment PMAC assigned its rights in the Koppel Plant to KSC for $94.9 million. *See* JSF at Item #40 and #41. In addition, in its agreement with KSC, PMAC agreed to indemnify KSC for environmental liabilities at the Koppel Plant, including "all required remedial actions" determined by the EPA or any other government agency. JSF Ex. J, PMAC Supp. Electronic Attach; PMAC-KSC Agreement, B&W Supp. Manual Attach., Ex. A.

### 5. *April 1990 Site Assessment*

B&W applied to the EPA for a permit to remove the EAF Dust at the Koppel Plant under the Resource Conservation and Recovery Act ("RCRA"). In addition, B&W applied for a permit with the Pennsylvania Department of Environmental Protection ("PA DEP"). The EPA conducted an environmental audit of the Koppel Plant in April 1990. A.T. Kearney, Inc. performed the EPA audit and released the results of its on-site investigation and interviews in a written report to the EPA on June 7, 1990 ("the Kearney Report"). *Id.* at Item #32 and #33. Although it is unclear from the record when the EPA gave B&W a copy of the Kearney Report, PMAC obtained a copy by October 19, 1990, when it forwarded the Report to Burgess & Niple for review and comment. *See* JSF

Exhibit J, Exhibit K, PMAC Supp. Electronic Attach.

As noted, the EPA can condition the issuance of a RCRA permit on the cleanup of contaminated areas besides those in the particular area for which a party is seeking a permit. 40 C.F.R. §§ 270.10-27 (describing RCRA Part B Permit application process). The EPA Report identified 48 Solid Waste Management Units ("SWMUs") and three Areas of Concern ("AOC"). Kearney Report, B&W Supp. Manual Attach., Ex. D. An SWMU is a discernable unit, such as a landfill, waste pile, or septic tank, containing solid waste requiring cleanup under RCRA. *See* Corrective Action for Releases From Solid Waste Management Units at Hazardous Waste Facilities, 61 Fed. Reg. 19432 (proposed May 1, 1996) (to be codified at 40 C.F.R. Ch. 1). An AOC generally refers to a waste area that warrants further investigation. *See* Corrective Action From Solid Waste Management Units at Hazardous Waste Management Facilities, 61 Fed. Reg. 19443 (proposed May 1, 1996) (to be codified at 40 C.F.R. Ch. 1). At its conclusion, the Kearney Report contained certain recommendations, including continued monitoring of ground-water, soil sampling, and integrity testing. Kearney Report, B&W Supp. Manual Attach., Ex. D. The Kearney Report did not recommend an additional RCRA facility investigation. *Id.*

PMAC gave a copy of the Kearney Report to KSC after the closing. *See* JSF, Item #42. In response, KSC asked PMAC to have

Burgess & Niple contact the EPA about discrepancies between the
Kearney Report and the February 28 Report, which it had obtained
from PMAC. Burgess & Niple contacted the EPA on November 5,
1990. JSF Ex. I, PMAC Supp. Electronic Attach. The EPA invited
Burgess & Niple to "submit comments or other SWMUs which [Burgess
& Niple] would like the [EPA] to consider." *Id*. On November 26,
1990, Burgess & Niple sent a letter to PMAC highlighting the "34
additional Areas which were not shown in [the Kearney Report] and
which [sic][Burgess & Niple] believe[d] may present potential
sources for the release of contaminants to the environment." JSF
Ex. K, PMAC Supp. Electronic Attach. These 34 additional problem
areas ("PAs") were in the February 28, Report but were not
disclosed to B&W in the March 15 Report. On December 6, 1990,
PMAC forwarded the letter to KSC and KSC forwarded sent a version
of it to the EPA ("the KSC Letter"). JSF Ex. L., PMAC Supp.
Electronic Attach.

Before it issued B&W's permit, the EPA revisited the Koppel
Plant on June 7, 1991 and conducted a Visual Site Investigation.
JSF, Item #47 n. 14. The Site Investigation is the second of a
three-step process under which the EPA proceeds in determining
whether, and upon what conditions, to issue a RCRA permit. *See*
U.S. EPA, NTIS PB 87-107769, RCRA Facility Assessment Guidance
1-2 (October 1986) (describing the three steps as preliminary
review, visual site inspection, and sampling visit). Generally,

the visual site inspection determines whether the facility should be investigated further in a RCRA Facility Investigation ("RFI"). *Id.* at 3-7. In this case, despite the KSC Letter, the EPA did not order an RFI at the Koppel Plant, and on September 30, 1991, the EPA issued a permit to B&W. JSF, Item #47. The EPA did not condition the permit on any remedial action. *Id.* at Item #47, n. 14. The permit stated that:

> Based on a review of the administrative record for this permit, including the Visual Site Investigation on June 7, 1991, EPA has determined that no corrective action is required at this facility at this time. If [the EPA] determines, subsequent to the issuance of this permit, that additional permit conditions are necessary to protect human health or the environment, as required by Sections 3004(u) and 3005(c)(3) [of RCRA], this permit will be modified in accordance with the applicable provisions of [RCRA regulations].

JSF, Item #47 at n. 14. The EPA did not seek to amend or place additional conditions on B&W's permit despite its authority to do so. *See* JSF, Item #48. In addition, the PA DEP issued B&W its permit on April 5, 1991 with no conditions listed.

### 6. *The EPA-KSC Consent Order*

In February 1993, the EPA requested information from both KSC and B&W about environmental problems at the Koppel Plant. EPA Letter to Golatzki, dated Feb. 23, 1993, B&W Supp. Manual Attach., Ex. X. The information request cited the KSC Letter directly. *Id.* On September 6, 1994, the EPA agreed to a Consent Order for environmental cleanup at the Koppel Plant with KSC. Consent Order, B&W Supp. Manual Attach., Ex. V. The EPA executed

a final Consent Order on March 14, 1995. *Id.* The scope of the
Consent Order extended to almost all of the SWMUs and AOCs
referred to in the Kearney Report, as well as the 34 PAs referred
to in the KSC letter. *Id.* The Consent Order, however, unlike
the Kearney Report or the B&W permit, required an RFI at the
Koppel Plant. *Id.* After the RFI was complete, the Consent Order
instructed KSC to generate a work plan for necessary
environmental cleanup measures, which the EPA would approve. *Id.*
As required by its agreement with KSC, PMAC performed these
measures. It now seeks reimbursement from B&W for the costs it
incurred.

**B.    PROCEDURAL BACKGROUND**

Before B&W filed bankruptcy proceedings, and after PMAC
completed the EPA-requested remedial actions at the Koppel Plant,
PMAC filed a claim in the United States District Court of the
Western District of Pennsylvania seeking to hold B&W responsible
for the Consent Order cleanup costs. JSF, Item #6. PMAC also
asserted several non-contractual claims based on state and
federal environmental regulations, including the Comprehensive
Environmental Response, Compensation and Liability Act
("CERCLA"). *Id.* In response, B&W filed a counterclaim seeking a
declaratory judgment that it was not responsible for the cleanup
costs under the PSA as amended. The parties agreed to dismiss
PMAC's suit without prejudice and proceeded in the declaratory

12

action. *Id.* After significant discovery, both PMAC and B&W filed motions for summary judgment. *Id.* at Item #9, 10. The Magistrate Judge denied both. *Id.* at Item #10.

On February 22, 2000, B&W filed for Chapter 11 bankruptcy relief. JSF, Item #11; *See* 11 U.S.C. § 101, *et seq.* As a result, an automatic stay was issued in the Pennsylvania litigation. JSF, Item #12. On April 18, 2000, PMAC filed a proof of claim for $1,305,299.55 from the debtor's estate as the cost of the Consent Order cleanup. JSF, Item #14. On July 18, 2003, B&W objected, denying liability for PMAC's claim. JSF, Item #15. In July 2008, at a pre-trial conference before the Bankruptcy Court, the parties agreed to submit the contract interpretation issue to the Bankruptcy Court solely on their briefs, oral arguments, and the depositions and documents produced in the Pennsylvania litigation. *In re Babcock & Wilcox Co.*, 413 B.R. at 340. After taking everything under advisement, the Bankruptcy Court ruled on B&W's objection to PMAC's claim. *Id.* The Court held that (1) under the amended PSA, PMAC was entitled to $147,203.99, which represents the costs PMAC proved were necessary to conduct remediation efforts in connection with the Kearney Report alone, and that (2) the amended PSA's exclusivity of remedy clause barred PMAC's non-contractual CERCLA and CERCLA-type liability claims because the amended PSA allocates all CERCLA and CERCLA-type liabilities within it. *Id.*

13

Both parties now appeal. PMAC argues that it is entitled to the full amount of its claim under the PSA and the First Amendment. PMAC Br. PMAC alternatively asserts that B&W is liable for the cleanup costs under various federal and state environmental regulations. *Id*. B&W, on the other hand, argues that it is not liable for any of the cleanup costs associated with the Consent Order, including those conducted in connection with the Kearney Report. B&W Br. B&W also denies liability under federal and state environmental regulations because it argues that the PSA exclusivity of remedy provision bars non-contractual claims. *Id.*

## II.  LEGAL STANDARD

### A.  JURISDICTION

This Court has jurisdiction over this case pursuant to 28 U.S.C. § 158(a) and Federal Rule of Bankruptcy Procedure 8001. *See* 28 U .S.C. § 158(a); Fed. R. Bankr. P. 8001.

### B.  STANDARD OF REVIEW

A district court reviews appeals from bankruptcy court rulings in the same manner that a court of appeals would review an appeal from a civil proceeding in a district court. *See* 28 U.S.C. § 158(c)(2). Accordingly, the Court reviews the Bankruptcy Court's conclusions of law *de novo*; and it reviews the bankruptcy court's findings of facts for clear error. *See In re Nat'l Gypsum Co.*, 208 F.3d 498, 504 (5th Cir. 2000). The Court

reviews the Bankruptcy Court's resolution of mixed questions of law and fact *de novo*. *Id.*

## C.    CONTRACT INTERPRETATION

Both parties agree that Pennsylvania law governs the PSA as amended. *See* PMAC Br.; B&W Br.; *see also* PSA Section 12.07, B&W Br., Ex. C ("This agreement shall be governed by and construed in accordance with the laws of the commonwealth of Pennsylvania."). Under Pennsylvania law, "in interpreting any contractual provision a court should show particular deference to the 'strongest external sign' of the parties' intentions—the words of their contract." *Philadelphia Elec. Co. v. Nat'l R.R. Passenger Corp.*, 1986 WL 6216 at *2 (E.D.Pa. May 30, 1986) (citing *Mellon Bank v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir. 1980)).  Whether those words are ambiguous is a question of law that the Court may answer by examining the context in which the agreement arose. *See St. Paul Fire and Marine Ins. Co. v. Lewis*, 935 F.2d 1428, 1431 (3d Cir. 1991); *Steuart v. McChesney*, 444 A.2d 659, 662 (Pa. 1982); *see also Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir. 1994) (noting that a court must "consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning."). "A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple

15

facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction." *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. Ct. 1995).

## III. DISCUSSION

The issue in this appeal is whether PMAC or B&W is responsible for remediation costs carried out between March 1995 and November 1997 under the terms of the amended PSA. The parties agree that the starting point of the Court's analysis is Section 2(b) of the First Amendment. *See* PMAC Br.; B&W Br.

## A.   SECTION 2(b) OF THE FIRST AMENDMENT TO THE PSA

The parties dispute two portions of Section 2(b): the scope of B&W's assumed liability and whether the term "remedial action" includes investigative costs and attorneys' fees. *See* PMAC Br.; B&W Br. Because the Court does not find B&W liable for any remedial costs under Section 2(b), it will address only B&W's assumed liability.

As previously stated, Section 2(b) reads, in part:

> Seller agrees to promptly and diligently undertake, whether before or after the Closing, all remedial actions necessary to clean up any Solid Waste Management Unit (as defined by the Resource Conservation Recovery Act ["RCRA"]) or Areas of Concern identified by the EPA and/or the PA DER as a result of the April, 1990 EPA and PA DER site assessment of the Koppel Plant and any other follow-up assessment or investigation related to the April, 1990 site assessment in connection with the RCRA

16

> Part B Closure of the Koppel Landfill and any Areas of
> Concern identified, provided such actions are based on
> conditions in existence at the Koppel Plant at or prior
> to the Effective Time (the "Koppel Site Assessment").

First Amendment to PSA, B&W Br., Ex. D. The Bankruptcy Court

interpreted Section 2(b) to mean that:

> B&W agreed to undertake all remedial actions necessary
> to clean up any SWMU or AOC identified by the EPA
> and/or PA DER,
> (A) in the April 1990 EPA site assessment, and
> (B) as a result of any other follow-up assessment or
> investigation related to
> > (1) the April 1990 EPA site assessment and
> > (2) any AOC identified therein.

*In re Babcock & Wilcox Co.*, 413 B.R. at 345 (formatting added).

The Bankruptcy Court provided three reasons for its

interpretation. First, it reasoned that interpreting Section

2(b) in this manner "gives meaning to 'any [AOC] identified'"

(i.e., (B)(2) above). *In re Babcock & Wilcox Co.*, 413 B.R. at

345. Second, the interpretation reflects the "where as, as is"

tenor of the PSA. *Id.* And third, the interpretation recognizes

that the parties could have expressly provided that B&W was

liable only for conditions imposed under the RCRA Part B Permit

if they had so intended. *Id.* The Bankruptcy Court then held

that since the written report on the April 1990 site assessment,

the Kearney Report, identified 48 SWMUs and three AOCs, B&W was

liable for the cleanup costs associated with them. The

Bankruptcy Court also held that the EPA did not do any follow-up

assessments as a result of the April 1990 site assessment. *Id.*

17

For this reason, the Bankruptcy Court held that B&W was not liable for the cleanup costs pertaining to the 34 PAs not identified by the EPA in the Kearney Report. *See In re Babcock & Wilcox Co.*, 413 B.R. at 345.

Both parties disagree with the Bankruptcy Court's interpretation. PMAC Br.; B&W Br. PMAC argues that the Consent Order is a "follow-up assessment or investigation" and the remediation work required under it thus constitutes costs for which B&W is liable. *See* PMAC Br. ("The language unequivocally encompasses the costs of complying with the March 1995 Consent Order."). B&W argues, on the other hand, that it is not responsible for any costs for remediation work under the Consent Order because the costs do not arise as conditions in B&W's RCRA permit. *See* B&W Br. ("Paragraph 2(b) of the First Amendment expressly limits B&W's liability to those environmental problems required to be remediated as conditions of B&W's RCRA Part B Permit.").

The problem with the Bankruptcy Court's opinion is that it is internally inconsistent. It holds B&W liable to remediate the 48 SWMUs and 3 AOCs identified in the Kearney Report. *See In re Babcock & Wilcox Co.*, 413 B.R. at 345. But the Kearney Report required no remedial action, and Section 2(b) applies to "remedial actions necessary to clean up" EPA identified environmental issues. First Amendment to PSA, B&W Br., Ex. D.

The Bankruptcy Court also found that there was no "follow-up assessment or investigation" after the Kearney Report. *Id.* Under this construction, there was no EPA decision making "remedial action" of the Kearney Report issues "necessary." The only logical conclusion from the Bankruptcy Court's reasoning is that B&W did not have to clean up any SWMU or AOC in the Kearney Report. The EPA did not find any "remedial action" was "necessary" to clean up anything mentioned in the Kearney Report until years later, after the EPA ordered a new RFI. If the new RFI was not a "follow-up" then the EPA had never made "remedial action necessary" on the items in the Kearney Report. *Id.*

The Court finds that the language of Section 2(b) is ambiguous as to the extent to which subsequent EPA action had to arise out of the RCRA Part B permit process. While Pennsylvania law requires the Court to give deference to the language of a contract, the language of Section 2(b) presents no clear "external sign" of the parties' intentions. *See Philadelphia Elec. Co.*, 1986 WL at *2 (requiring deference). The interpretations offered by the parties do not square with the language of Section 2(b). Under PMAC's interpretation, Section 2(b) would cover *any* future EPA investigation at the Koppel Plant no matter how tenuous its relationship to the "April 1990 site assessment in connection with the RCRA Part B Closure of the Koppel landfill and any AOC identified." First Amendment to PSA,

19

B&W Br., Ex. D; PMAC Br.  If that were the parties' intentions,
they could have said so.  PMAC's interpretation ignores a number
of limiting words and phrases.  For example, Section 2(b)
requires that the subsequent assessment or investigation be a
"follow-up" to the April 1990 assessment "in connection with the
RCRA Part B Closure of the Koppel Landfill and any AOC
identified."  *Id.*  B&W's interpretation is closer to the mark.
Under it, no follow-up investigation could occur because the EPA
did not require one as a condition of B&W's permit.  B&W Br.
Yet, the phrase "in connection with the RCRA Part B Closure of
the Koppel Landfill" upon which B&W relies is subject to two
potential constructions.  *See* First Amendment to the PSA, B&W
Br., Ex. D.  On the one hand, the phrase could be read as merely
descriptive of the April 1990 EPA site assessment (i.e., (B)(1)
above).  *Id.*  On the other hand, the phrase could be read as an
additional limiting condition on any "follow-up assessment or
investigation"  *Id.*  As a result, the language of Section 2(b)
alone does not provide a clear and unambiguous "signal" of the
parties' intentions, *see Mellon Bank*, 619 F.2d at 1009, and its
plain meaning escapes the Court.

The Court finds that Section 2(b) holds B&W liable for
remedial action arising from the RCRA Part B permit process.
That is, Section 2(b) covers only remedial actions related to the
permitting process, including the EPA's investigation and

evaluation of B&W's permit application, the issuance and conditions required under B&W's permit, or any modification of B&W's permit. Section 2(b)'s language supports this conclusion in two different ways. The agreement requires B&W's obligations to spring from the April 1990 site assessment, which initiated the permit process for the "RCRA Part B Closure of the Koppel Landfill." The EPA conducted the April 1990 site assessment under its permitting authority and as a first step in its evaluation of B&W's permit application. JSF, Item #32. Section 2(b) says that any subsequent investigation or assessment must both "follow-up" and "relate to" the first assessment made "in connection with the RCRA Part B Closure of the Koppel Landfill," which suggests that any follow-up must be part of the permit process itself. *See* First Amendment to the PSA, B&W Br., Ex. D. This follows because the agreement's language requires both a temporal and subject matter link to the first action in the permit process. *Id.*

Moreover, the allocation of environmental liability in the PSA generally, and the parties' knowledge at the time they drafted Section 2(b) in particular, each support the Court's interpretation. The PSA as a whole suggests that the parties intended for PMAC to assume known environmental issues, except for those related to the cleanup and removal of EAF Dust. *See* PSA, Section 3.03, B&W Br., Ex. C (PMAC assumed liabilities);

PSA, Section 3.04(h), B&W Br., Ex. C (B&W assumed liability for EAF Dust); PSA, Section 6.11, B&W Br., Ex. C (B&W assumed responsibility for EPA permit). PMAC assumed liability for these problems, either by expressly contracting for them in the PSA or by proceeding with the deal after B&W refused to accept liability for the issues PMAC identified and proffered under Section 6.08(a) of the PSA. *See* First Amendment to PSA, B&W Br., Ex. D (providing credit on purchase price). B&W assumed liability for the EAF Dust expressly in the PSA. PSA, Section 3.04(h), B&W Br., Ex. C. To clean up the dust, B&W transferred it to an offsite landfill. But more importantly for this appeal, B&W also applied to the EPA for a permit that would signify that both the dust sites at the Koppel Plant and the offsite landfill were in compliance with environmental regulations. JSF, Item #32. The issuance of the permit thus signified that B&W had cured those environmental issues for which it assumed liability.

Further, at the time the parties drafted Section 2(b), each knew that the EPA would conduct a site assessment of the Koppel Plant. JSF, Item #32. The parties also knew that the EPA could require remedial action in its written report on the site assessment, including further investigation or cleanup work covering environmental problems related or unrelated to the EAF Dust and its removal. *See* PMAC Br. Furthermore, the parties knew that the EPA could conduct future investigations or

assessments of the Koppel Plant before issuing B&W's permit and the EPA could condition B&W's permit on remedial measures. The parties also knew that the EPA could later modify B&W's permit and require additional remedial work. *See* 42 U.S.C. § 6901 et. seq (permitting authority); 40 C.F.R. § 270.41 (modification).

In sum, that Section 2(b) holds B&W liable for remedial work ordered as part of the permitting process follows from the parties knowledge at the time of drafting and the fact that B&W assumed liabilities pertaining to EAF Dust in the PSA. Section 2(b) would have covered any conditions of the permit, or remedial action that resulted from an RFI ordered by the EPA before it issued the permit or in connection with a subsequent modification of the permit. For example, if the EPA ordered an RFI following its June 1991 site investigation before it issued B&W's permit, B&W would have been liable for the remediation costs ordered as a result. Moreover, the difference in price between PMAC's purchase and subsequent sale of the Koppel Plant suggests that PMAC assumed liability for known environmental issues not resulting from the EPA permit process that B&W had initiated before closing. PMAC paid approximately $50 million for the Koppel Plant and four other facilities and sold the Koppel Plant and one other purchased facility the same day for $94.9 million. *See* PMAC-KSC Agreement, B&W Supp. Manual Attach., Ex. A.

PMAC incurred the costs at issue in this appeal as a result

of actions required under the 1995 Consent Order between the EPA
and KSC.  JSF, Item #61.  Under the Court's interpretation of
Section 2(b), the question presented is thus whether the Consent
Order was part of the permit process.

The Court does not find that the Consent Order was part of
the EPA permit process.  After the EPA issued the Kearney
Report, PMAC asked the EPA for the opportunity to comment on the
report.[2]  *See* JSF Exhibit I, PMAC Supp. Electronic Attach.  In so
doing, PMAC sought to induce the EPA to require further
investigation of the Koppel Plant or incorporate the 78
environmental problems identified in the February 28 Report as
conditions for B&W's permit.  *Id.*  Though it had the power to do
so, the EPA did not order further investigation in response to
PMAC's entreaty.  After the EPA received PMAC's request, however,
it conducted a second visual inspection of the Koppel Plant in
June 1991.  JSF, Item #47 at n. 14.  Again, the EPA did not
require any remedial action or further investigation as a result
of its June 1991 inspection.  *Id.*  When the EPA issued B&W's
permit in September 1991, it also did so without requiring

---

[2] The Bankruptcy Court indicates that "the EPA sent Burgess
a memo that explained that it planned to issue B&W a draft RCRA
Part B permit by January 1, 1991 and asked Burgess to suggest
SWMUs and AOCs that Burgess wanted the EPA to consider assigning
B&W as conditions for the permit."  While this is technically
true, it implies that the EPA request was unsolicited.  In fact,
Burges & Niple contacted the EPA at PMAC's behest.  The EPA memo
the Bankruptcy Court refers to was in response to Burges &
Niple's request to comment.

further investigation and without conditioning the permit on remedial work. *See* JSF, Item #47 at n. 14; Letter dated September 30, 1991 to Victor Catania, B&W Supp. Manual Attach., Ex. W. In addition, the EPA did not later modify B&W's permit to require an RFI or remedial action even though PMAC, by and through the KSC letter, provided the EPA with new information. If the EPA found that this information justified it, the EPA could have modified B&W's permit. *See* 40 C.F.R. § 270.41(a)(1990); *Shell Oil Co. v. E.P.A.*, 950 F.2d 741, 765 n. 12 (D.C. Cir. 1991)("The EPA may modify a permit, among other reasons, to account for: . . . new information that would have justified the inclusion of different conditions at the time of the permit's issuance.") (citing 40 C.F.R. § 270.41). But it did not. It was not until almost three years after the April 1990 site assessment and well after the EPA issued B&W's permit that the EPA contacted KSC about environmental issues at the Koppel Plant. EPA Letter to Golatzki, dated Feb. 23, 1993, B&W Supp. Manual Attach., Ex. X. And, the EPA request did not refer to the April 1990 site assessment as prompting the inquiry, but instead to KSC's own letter. *See In re Babcock & Wilcox Co.*, 413 B.R. at 345. Though the EPA later required a facility investigation at Koppel in 1995 as part of the "work to be performed" under the Consent Order, the Court does not find that this investigation was part of the permitting process. *Id.* Consequently, B&W is

not liable for any remedial actions required as a result.

**B.    ALTERNATE ARGUMENTS FOR LIABILITY**

PMAC argues in the alternative that even if B&W is not liable for costs incurred under Section 2(b) of the First Amendment, B&W is liable for all costs under (1) Section 6.08 of the PSA, and (2) under the various environmental statutes for which the PSA does not explicitly except liability. *See* PMAC Br. The Bankruptcy Court rejected each of PMAC's alternate arguments. First, the Bankruptcy Court found that PMAC "discovered" all required remedial actions before closing, and thus B&W was not liable under Section 6.08 of the PSA. *In re Babcock & Wilcox Co.*, 413 B.R. at 346. And second, the Bankruptcy Court held that the exclusivity of remedy provision in the PSA and other related PSA provisions allocating environmental liabilities precluded PMAC's non-contractual claims. *Id.*

**1.    *Section 6.08 of The Purchase and Sale Agreement***

In general, Section 6.08(a) and 6.08(b) of the PSA cover liability for those environmental problems "discovered" before and after closing. PSA, B&W Br., Ex. C. Section 6.08(b) reads, in pertinent part:

> (b) With respect to environmental problems existing at the Plants ... first *discovered after* [closing] and on or prior to the fifth anniversary of the [closing], [PMAC] shall bear the first Two Hundred Fifty Thousand ($250,000.00) Dollars in the aggregate of any costs paid or expenses actually incurred...Environmental problems existing ...in excess of the first Two Hundred Fifty

26

Thousand ($250,000.00) Dollars ... will be shared by [B&W] and [PMAC] on [two-thirds, one-third basis].

PSA, B&W Br., Ex. C (emphasis added).

PMAC argues that B&W is liable for those cleanup measures concerning environmental problems not identified in the Kearney Report because the environmental problems were "discovered" after closing. Specifically, PMAC argues that the February 28 Report was a "draft report" and the environmental problems listed in it included "speculative environmental concerns." *Id.* PMAC further argues that it did not label these concerns as "Identified Actions" under Section 6.08(a) and therefore, PMAC did not "discover" the environmental problems before closing.[3]

---

[3] Section 6.08(a) states in full:

6.08 Environmental Matters. (A) On or prior to March 15, 1990, Buyer shall provide to Seller in writing (i) the written results of the environmental audit of the Plants (the "Environmental Audit Results"), and (ii) a list of all actions with respect to clean-up or remediation of existing environmental problems (i.e., conditions requiring remedial actions under laws and regulations in effect as of the Agreement Date) recommended by Remcor Corporation or such other qualified environmental consultant(s) as Buyer may select (the "Environmental Consultant") and which Buyer would require Seller to undertake to remediate on a mutually acceptable basis. Seller shall have a period of fourteen (14) days after the date of receipt of such materials (the "Review Period") to have the Environmental Audit Results reviewed by its own environmental consultants and to discuss the results of such review with the Environmental Consultants. The Environmental Audit Results and the actions identified on the list referred to in clause (ii) above, as the Environmental Consultant may have modified them in response to the discussions referred to in the preceding sentence, shall be referred to herein as the

*Id.* PMAC also contends that it had no obligation under the PSA to provide B&W with an inventory of "speculative environmental problems," such as those identified in the February 28 Report, and that B&W was aware of any speculative environmental problems before closing by virtue of its ownership of the Koppel Plant.

Whether or not PMAC "discovered" the environmental problems addressed in the 1995 Consent Order, RCRA Facility Investigation,

---

"Reviewed Audit Results" and the "Identified Actions", respectively. Subject to Seller's obligation to pay the first Five Hundred Thousand ($500,000.00) Dollars of costs or expenses actually incurred in remediating Identified Actions, on or before the fifth day after the end of the Review Period, Seller shall give Buyer written notice (the "Refusal Notice") of any Identified Actions that Seller is unable or unwilling to take. Any Identified Action not specifically referred to in the Refusal Notice shall constitute an "Undertaken Action." If Seller delivers a Refusal Notice, Buyer shall be entitled on or before the tenth day after receipt of a refusal Notice to either (x) terminate the transactions contemplated by this Agreement and receive a refund of the Deposit plus accumulated interest thereon from the Agreement Date to the date of termination at LIBOR less 3/8ths of a percentage point, or (y) proceed with the transactions contemplated by this Agreement, in which latter case all obligations or liabilities to perform any of the Identified Actions listed in the Refusal Notice, together with any liabilities resulting from the failure to perform such Identified Actions or the timing or manner of their performance shall be assumed by Buyer (the "Assumed Remediation Liabilities"); provided, however, that Seller shall be responsible for any costs paid or expenses actually incurred by Buyer for the first Five Hundred Thousand ($500,000) Dollars for remediating any Assumed Remediation Liabilities. Buyer's failure to timely deliver a notice pursuant to the preceding sentence shall be deemed an election in favor of alternative (y).

(PSA Section 6.08(a), B&W Br., Ex. C)

and EPA approved work plan before the closing is an issue of fact, for which this Court reviews the Bankruptcy Court's findings for clear error. *See In re Nat'l Gypsum Co.*, 208 F.3d 498, 504 (5th Cir. 2000). The Bankruptcy Court found that PMAC received the February 28 Report before closing and "first discovered" all environmental problems addressed within it at that time. *See In re Babcock & Wilcox Co.*, 413 B.R. at 346. There is no clear error with the Bankruptcy Court's findings. PMAC's access to the February 28 Report, and subsequent modification of it to create the March 15 Report, evinces a clear knowledge of the February 28 Report's contents. That PMAC omitted lower risk environmental problems from the March 15 Report does not require a different conclusion. To the extent that PMAC intended for B&W to assume liability for lower risk environmental concerns, it had every opportunity to do so through the course of its negotiations with B&W.

Lastly, the Court is not persuaded by PMAC's arguments that it had no obligation under the PSA to identify environmental problems or that B&W knew of all environmental problems before closing because of its pre-existing ownership of the Koppel Plant. PMAC Br. First, Section 6.08(a) requires PMAC—not B&W—to review the requisite environmental audit and provide an initial list of "Identified Actions." *Id.* PMAC did this, and chose not to include those concerns addressed in the February 28 Report.

Section 6.08(a) reinforces this conclusion by requiring PMAC to provide B&W with "a list of *all* actions with respect to clean-up or remediation of existing problems ... and which [PMAC] would require [B&W] to undertake to remediate on a mutually acceptable basis." *Id.* (emphasis added). The term "all" requires PMAC to address any actions for which it wants B&W to assume liability. There is no error in the Bankruptcy Court's conclusion that PMAC discovered the environmental problems at issue before closing.

## 2. *Non-Contractual Claims*

PMAC claims that B&W is liable for Consent Order cleanup costs on five non-contractual grounds: (1) Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607, 9613; (2) Section 2201 of the Declaratory Judgment Act, 28 U.S.C. § 2201; (3) the Pennsylvania Hazardous Sites Cleanup Act, 35 Pa. Cons. Stat. Ann. §§ 6022.101 *et seq* (2003); (4) the Pennsylvania Storage Tank and Spill Prevention Act, 35 Pa. Cons. Stat. Ann. §§ 6021.101, *et seq.* (2003); and (5) Pennsylvania common law. PMAC Counterclaim, Manual attach Ex. Z. B&W argues, however, that the "exclusivity of remedy" clause in Section 10.05 of the PSA allocates all environmental liabilities between the parties and thus bars PMAC's non-contractual claims. *See* B&W Br.

PMAC argues that each of its non-contractual causes of action are "CERCLA-type liabilities" and thus require specific language of indemnification to be contractually barred. Such

language, PMAC argues, is not present in the PSA. *See* PMAC Br. The Bankruptcy Court found, however, that the PSA allocated all CERCLA and CERCLA-type liabilities and therefore B&W was not liable for Consent Order cleanup costs under PMAC's non-contractual claims. *In re Babcock & Wilcox Co.*, 413 B.R. at, 346. This Court finds no error in that conclusion.

Section 107(e)(1) of CERCLA states:

> No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

42 U.S.C. § 9607(e)(1). Six appellate courts have interpreted this provision, *see Hatco Corp. v. W.R. Grace & Co. Conn.*, 59 F.3d 400 (3d Cir. 1995); *Olin Corp. v. Consol. Aluminum Corp.,* 5 F.3d 10 (2d Cir. 1993); *John S. Boyd Co., Inc. v. Boston Gas Co.*, 992 F.2d 401 (1st Cir. 1993); *United States v. Hardage,* 985 F.2d 1427 (10th Cir. 1993); *AM Int'l Inc. v. Int'l Forging Equipment Corp.*, 982 F.2d 989 (6th Cir. 1993); *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454 (9th Cir. 1986), and each has held that a responsible party cannot contract away its CERCLA cleanup liability, but it may agree to allocate the ultimate financial burden of that liability in contract. *See Olin Corp.*, 5 F.3d at 14 ("private parties may contract with respect to indemnification

and contribution" but "all responsible parties remain fully liable to the government"); *Hatco Corp.*, F.3d at 404 (same); *John S. Boyd Co., Inc.*, 992 F.2d at 405 (a party cannot escape liability by means of a contract with another party" but parties "can allocate responsibility among themselves by contract"). Contracting parties need not explicitly refer to CERCLA in contracting for release of CERCLA liability. *See Fisher Dev. Co. v. Boise Cascade Corp.*, 37 F.3d 104, 110 (3d Cir. 1994) (citing *Beazer E. Inc. v. The Mead Corp.*, 34 F.3d 206 (3d Cir. 1994) ("[i]n short, while there will be some instances in which CERCLA claims are inadvertently released if general releases are enforced as written, we think there would be far more instances, if [a specific release requirement] were adopted, in which parties inadvertently fail to release their CERCLA claims when they intend to do so.").[4]

PMAC argues that the PSA's exclusivity of remedy provision, Section 10.05, does not bar its non-contractual claims because the provision does not explicitly refer to CERCLA, and therefore B&W must meet a higher legal standard under *Beazer East Inc. v. The Mead Corporation*, 34 F.3d 206 (3d Cir. 1994). *See* PMAC Br. *Beazer* does not establish the legal standard applicable here. As

---

[4] The Bankruptcy Court distinguishes between release provisions and indemnification provision in its Order. In this case, this appears to be a distinction without a difference. The Bankruptcy Court cites the legal standard articulated in *M&M Realty* as applying to both types of clauses.

a threshold matter, state contract law governs the allocation of liability for CERCLA and CERCLA-type claims. *See SmithKline Beecham Corp. v. Rohm & Haas Co.*, 89 F.3d 154, 158 (3d Cir. 1996). *Beazer* concerned the application of Alabama law, not Pennsylvania law, which both parties agree governs the provisions of the PSA, as amended. *Beazer E. Inc.*, 34 F.3d at 206. Moreover, while the *Beazer* Court refused to construe a particular contractual provision as a clear promise to indemnify a purchaser for CERCLA and CERCLA-type liability, the Court ultimately remanded the case for the district court to determine the contracting parties' intentions.[5] *See Beazer E., Inc. v. Mead Corp.*, 412 F.3d 429 (3d Cir. 2005).

The appropriate legal standard, under Pennsylvania law, is set-out in *Keystone Chemical Co. v. Mayer Pollock Steel Corp.*, 1997 WL 401587 (E.D.Pa. July 10, 1997); *M & M Realty, Co.*, 977 F.Supp. at 683, and *County of Delaware v. J.P. Mascaro & Sons*, 830 A.2d 587 (Pa. Super. 2003). In *M & M Realty, Co.*, the Third

---

[5] By comparison, the contraction provision in *Beazer* states:

As of the Closing Date, Buyer [Beazer] shall assume and agree to perform: ...
(c)Obligations of the [Seller] to comply from and after the Closing Date with all of the terms and conditions of ... any solid waste disposal permit, license or order, hereafter issued by the United States Environmental Protection Agency ... all in accordance with applications now pending and listed on Exhibit F hereto.

*Beazer*, 34 F.3d at 216.

Circuit concluded that, under Pennsylvania Law, allocation of CERCLA liability is not possible without "explicit language of indemnification, clearly manifesting the parties' intent to transfer environmental liability. 977 F.Supp. at 688. In *County of Delaware*, the Court clarified that such "explicit language" does not require a specific reference to the CERCLA statute. 830 A.2d at 587 (affirming trial court decision that indemnity clause, which did not reference CERCLA, was sufficient to include CERCLA-type liabilities). And lastly, *Keystone* held that a broad indemnity provision could include CERCLA liabilities without direct reference when the parties intentions to do so is clear from both the language of the provision and construction of the entire agreement. 1997 WL 401587 at *3.

In this case, the parties allocated all liability within the PSA itself. Section 10.05 limits all remedies to those explicitly stated in the PSA, as amended. (PSA, B&W Br., Ex. C). The provision states:

> 10.05 Sole and Exclusive Liability. The sole and exclusive liability of an Indemnifying Party and the sole and exclusive remedy of an Indemnified Party, whether based on contract, tort (including negligence), strict liability or otherwise, shall be *as provided herein*. Notwithstanding any other provision of this Agreeement, in no event shall an Indemnifying Party be obligated to indemnify an Indemnified Party, whether based on contract, tort (including negligence), strict liability or otherwise, for loss of anticipated profits, cost of money, loss of use of capital or revenue, or for any special, incidental or consequential loss or damage suffered by an Indemnified Party of any nature arising at any time or from any cause whatsoever.

34

*Id.* (emphasis added). Section 3.03(e), Section 6.08, and Section 2 of the First Amendment to the PSA buttress Section 10.05's general language in relation to particular environmental liabilities. In Section 3.03(e), for example, PMAC assumed:

> All liabilities and obligations arising out of, resulting from, or relating to ... the discharge, emission or release of Pollutants and Contaminants from the business or the generation, treatment, storage, or disposal of any Wastes [by B&W] ... at or upon the real property included in the Acquired Assets ... prior to [closing] as provided in Section 6.08.

*Id.* Section 6.08 then allocates between PMAC and B&W those environmental liabilities discovered before and after closing. *Id.* Lastly, Section 2 of the First Amendment, which the parties negotiated after an environmental audit of the Koppel Plant allocates liability for specific environmental problems, including the RCRA Part B Permit process and the Wallace Run pickle liquor spill, with Section 2(b) acting as a residual "catch-all" provision to address unspecified environmental problems. *Id.* The extent of these contractual provisions, their complexity and in-depth nature, as well as the fact that Section 6.08 and Section 2 of the First Amendment are each premised on an environmental audit, suggests that the parties intention was to allocate responsibility for all environmental liabilities within the PSA itself. The deposition testimony of PMAC's own counsel further supports this conclusion. *See* Boyar Dep., B&W Supp. Manual Attach, Ex. G ("A: We didn't use those specific terms, but

the intention was to allocate all environmental liabilities related to these properties as we then defined them in our negotiations in this language and then clarified it and refined it and ended up with 2(b) of the first amendment. Q: Okay. And it was not intended to leave categories of environmental liability unallocated, just unaddressed, for later resolution. A: That's correct.").

PMAC further relies on *M & M Realty* to argue that Section 10.05, and the various environmental liability provisions of the amended PSA are not "broad enough" to encompass CERCLA and CERCLA-type liabilities. 977 F.Supp. at 683; *see* PMAC Br. In that case, a Pennsylvania District Court held that an "as is" provision did not bar a purchaser's CERCLA and CERCLA-type claims. *Id.* As is clear from the discussion above, the allocation of environmental liability within the amended PSA is premised on far more than a single "as is" provision. In addition to an "as is" clause, *see* PSA Section IV, the PSA contains broad indemnity language, an exclusivity of remedy provision, and specific provisions detailing the allocation of environmental liabilities. As a result, the amended PSA bars PMAC's non-contractual CERCLA and CERCLA-type liability claims and B&W is not liable for Consent Order cleanup costs and expenses thereunder.

## IV. CONCLUSION

For the foregoing reasons, the Court VACATES the Bankruptcy Court's April 8, 2009 Order and REMANDS with instructions to DISMISS PMAC's claim.

It is so Ordered.


New Orleans, Louisiana, this __22nd__ day of February, 2010.

_Sarah Vance_

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE